of the pilot of the steamer, given in this very cause, shows that by using a night-glass, from the bridge even, the bark would have been seen sooner than it was possible for the lookouts to see her, and he undertakes to say that in fact he, by using his glass, did see the bark before she was reported by the lookout; but his testimony in this respect is contradicted and overthrown by the other witnesses for the steamship, who, as is conceded by the claimants, prove that no one upon the steamer saw the bark before she was seen by the lookout ahead, when she was under their bows. And it is not pretended that any officer made any use of his glass as they passed through the swash. This omission I consider to be negligence. To require that a night-glass be put in the hands of seamen stationed on the look-out would neither be reasonable nor useful. Nor would the use of a night-glass by an officer upon occasion dispense with the necessity of having a stationed lookout forward; but certainly it is not unreasonable to say that when several of the officers of this steamer were on deck, provided with glasses which would have enabled them to discern the bark before the lookouts could, and of which they made no use at all, they were guilty of negligence. I do not say that in every dark night, or that at all difficult places, the omission to use a night-glass would be negligence; but I do say that with such a narrow channel leading into such a harbor, to be passed by such a steamship as the Ville du Havre at her then rate of speed, it was negligence on the part of the officers not to use the glasses which they had with them, and which their own pilot swears would have enabled them to see the bark sooner than she was seen, and, as I cannot doubt, in time to make the slight change necessary to avoid her.

I am aware that no statute exists requiring the use of the night-glass, and that its use on any occasion has not been in terms made obligatory by any rule of the maritime law, and I know of no adjudged case which has mentioned such a requirement.

But the rule of the maritime law which requires a good lookout to be kept, in principle covers the case. For the rigor of that rule rises with the power and speed of the vessel and the hazard of the navigation in which she is for the time engaged. Situated as this steamer was, the best possible lookout ahead was the only good lookout. Here intelligent eyes, aided by the night-glass, and capable of examining every yard of the channel before them, were at hand. Had they been resorted to, it seems certain that the disaster would not have occurred; and for the omission to resort to this effective means the steamship must be accounted guilty of fault. Fault thus appearing on both vessels. the damages must be apportioned, and a decree will be entered accordingly.

VINACKE (REEVES v.). See Case No. 11,-663

---

## Case No. 16,944.

### The VINCENNES.

District Court, D. Maine. 1851.

SHIPPING—TITLE TO VESSELS—DISAGREEMENT AMONG MOIETY OWNERS.

In this case there were three part owners of the vessel, one owning a moiety, and the other two a quarter each. The owner of the moiety was in possession, and was ship's husband; but the parties disagreed as to the voyage, and, on application of the two part owners of the one moiety, the vessel was ordered to be sold.

[Cited in The Annie H. Smith, Case No. 420.]

[Decided by WARE, District Judge. Nowhere reported; opinion not now accessible. Statement of the point decided was taken from 2 Pars. Shipp. & Adm. 343.]

---

## Case No. 16,945.

### The VINCENNES.

[3 Ware, 171;.[1] 21 Law Rep. 616.]

District Court, D. Massachusetts. July 17, 1858.

RES JUDICATA—SHIPPING—CHARTER-PARTY—SEAWORTHINESS—BURDEN OF PROOF—EVIDENCE.

1. When a former judgment is relied on as a defence in the admiralty, it should appear by the record that the precise question or title set up was passed upon in a former suit, not merely that it might have been.

2. For a ship to be seaworthy for the voyage, she must be manned by a competent master and crew.

[Cited in Premuda v. Goepel, 23 Fed. 412; The Giles Loring, 48 Fed. 470.]

3. In a libel by the owners on a charter-party, for refusing to furnish a cargo on the pretence that the ship was unseaworthy, the burthen of proving the seaworthiness is upon the owners.

4. When the question of seaworthiness is in issue, evidence of the performance of voyages, immediately before or after that contemplated is inadmissible, except so far as they may offer just inferences as to her actual condition at the time.

In admiralty.

B. F. Hallett, for libellants.
W. G. Russel, for respondent.

WARE, District Judge. This is a libel on a charter-party. Henry Jones & Co., merchants in Boston, chartered the brig Vincennes on the 22d of December, 1853, then lying in that port. for a voyage from Baltimore to Boston. The vessel was immediately to proceed to Baltimore, where the charterers agreed to furnish a full cargo, both under and on deck, of white oak ship-plank, of the dimensions mentioned, with treenails for small stowage, and to pay freight at the rate fixed by the contract on the delivery of the same at Boston. The lay days for loading were to commence two days after the master reported his vessel ready to receive

---

[1] [Reported by George F. Emery, Esq.]